## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *JOHN J. SPERZEL, III,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:20-cv-00193-GZS* |
| | ) | |
| *CHEMBIO DIAGNOSTICS, INC.,* | ) | |
| | ) | |
| *Defendant* | ) | |

## RECOMMENDED DECISION ON MOTION TO DISMISS
## FOR LACK OF PERSONAL JURISDICTION

In this suit arising from the alleged unlawful refusal of defendant Chembio Diagnostics, Inc. ("Chembio") to allow its former chief executive officer, plaintiff John J. Sperzel, III, to exercise his Chembio stock options, Chembio moves pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss the complaint for lack of personal jurisdiction. *See* Motion to Dismiss ("Motion") (ECF No. 16) at 1-2; Complaint and Demand for Jury Trial ("Complaint") (ECF No. 1) ¶¶ 1-10. For the reasons that follow, I conclude that Sperzel fails to demonstrate the appropriateness of the exercise of personal jurisdiction over Chembio in this forum and, hence, recommend that the court grant the Motion and dismiss the Complaint without prejudice.[1]

## I.  Applicable Legal Standards

"When a court's jurisdiction is contested" pursuant to Rule 12(b)(2), "the plaintiff bears the burden of proving that jurisdiction lies in the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995). "To establish personal jurisdiction in a diversity case" such as this, "a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the

---

[1] The "dismissal of a claim for lack of personal jurisdiction is not on the merits and is without prejudice[.]" *Pushor v. Mount Wash. Observatory, Inc*., Docket No. 2:17-cv-354-NT, 2018 WL 3478892, at *2 n.6 (D. Me. July 19, 2018).

Fourteenth Amendment." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014). "Because the Law Court has deemed Maine's long-arm statute coextensive with the permissible exercise of personal jurisdiction under the Due Process Clause of the Fourteenth Amendment, the due process inquiry controls in the present case." *Lucerne Farms v. Baling Techs., Inc.*, 226 F. Supp. 2d 255, 257 (D. Me. 2002).

The "constitutional touchstone for personal jurisdiction" is "minimum contacts" between a defendant and the forum state. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992). A defendant must have "sufficient contacts with the forum state so that subjecting him, her, or it to the forum's jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* (citation and internal quotation marks omitted).

In turn, "[i]n analyzing minimum contacts," the First Circuit has "recognized two types of personal jurisdiction: general and specific." *Id.* at 1088. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.* Specific jurisdiction exists when "(1) [the] claim[s] directly arise[ ] out of or relate[ ] to the defendant's forum activities; (2) the defendant's forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering the defendant's involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable." *Plixer Int'l, Inc. v. Scrutinizer GmbH,* 905 F.3d 1, 7 (1st Cir. 2018).

There are three recognized standards for determining whether the exercise of personal jurisdiction is lawful: the *prima facie* standard, the preponderance standard, and the likelihood standard. *Rodriguez v. Fullerton Tires Corp.,* 115 F.3d 81, 83 (1st Cir. 1997); *see also Foster-*

*Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-47 (1st Cir. 1995) (outlining standards and circumstances under which they apply).

When, as here, the court makes a jurisdictional ruling without holding an evidentiary hearing, the *prima facie* standard applies. *See, e.g.*, *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). Under that standard, "the inquiry is whether the plaintiff has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Id.* "It is not enough for [the plaintiff] to rely on unsupported allegations in [the] pleadings." *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 (1st Cir. 2016) (citation and internal quotation marks omitted). "Rather, [the plaintiff] must put forward evidence of specific facts to demonstrate that jurisdiction exists." *Id.* (citation and internal quotation marks omitted).

In assessing this showing, the court "must accept the plaintiff's (properly documented) evidentiary proffers as true . . . (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002) (citations and internal quotation marks omitted). Here, I have done so, taking into account relevant evidence adduced by Chembio only to the extent that it does not conflict with Sperzel's evidence.

Sperzel seeks to make a *prima facie* showing that the court has specific jurisdiction over Chembio, conceding that, in the absence of jurisdictional discovery, he cannot show that general jurisdiction exists. *See* Plaintiff's Opposition to Defendant's Motion to Dismiss ("Opposition") (ECF No. 23) at 10-11.

## II. Factual Background

Sperzel is the former president and CEO of Chembio, a publicly-traded Nevada corporation with its principal place of business in Hauppauge, New York, which is on Long Island. Affidavit of John J. Sperzel, III ("Sperzel Aff.") (ECF No. 24) ¶ 1; Declaration of Neil Goldman ("Goldman

Decl.") (ECF No. 17) ¶ 3.  Chembio develops point-of-care diagnostic tests for infectious diseases.

Complaint ¶ 1.  Sperzel grew up in Maine, spent his freshman year at the University of Maine in

Orono, Maine, and has been a Maine resident since 2014.  Sperzel Aff. ¶ 2.  Before then, he lived

in New Jersey.  *Id*. ¶¶ 12, 45.

Chembio has no employees located in Maine and is not registered with the Maine Secretary

of State to do business in Maine.  Goldman Decl. ¶¶ 17-18.  Although Chembio does not maintain

an official office in Maine, Chembio sales representatives cover certain sales territories that

include Maine.  Sperzel Aff. ¶ 48.  Chembio's website is also accessible to Maine residents.  *Id*.

¶ 50.  Between January 2019 and June 2020, Chembio shipped product totaling $2,306.23 in value

to Maine.  Goldman Decl. ¶ 19.  Chembio's total gross product sales in 2019 were $28.8 million,

of which $4.8 million was generated from product sales in the United States.  Sperzel Aff. ¶ 49.

In December 2013, Sperzel was contacted by an executive search firm that had been

retained by the Chembio Board of Directors to identify a new CEO.  *Id*. ¶ 4.  In negotiating his

potential employment, Sperzel communicated with the executive search firm and members of the

Chembio Board of Directors while he was physically located in Maine.  *Id*. ¶ 5.  Those negotiations

culminated in the execution of an employment agreement dated March 13, 2014 (the "2014

Employment Agreement"), which Sperzel signed while in Maine and which bears his Maine

residential address.  *Id*. ¶¶ 6-7; [2014] Employment Agreement, Exh. A (ECF No. 17-1) to

Goldman Decl., at 13.  The 2014 Employment Agreement contained provisions applying New

York law to disputes arising out of the contract and setting forth Sperzel's consent to the personal

jurisdiction of the federal and state courts of New York with respect to any lawsuit filed against

him by Chembio relating to the contract.  2014 Employment Agreement at 12, § 16.

During negotiations over the 2014 Employment Agreement, Sperzel recommended that Chembio open a small corporate office in Massachusetts because it is a hub of life science technology and innovation, investors, and senior executives.  Sperzel Aff. ¶ 8.  Chembio agreed that this was a good idea and added a provision to Sperzel's employment agreement contemplating travel between Massachusetts and New York.  *Id.*; 2014 Employment Agreement at 3, § 5(f).  Although the proposal was never implemented, Sperzel continued to be entitled pursuant to the 2014 Employment Agreement to reimbursement of expenses of travel between Massachusetts and New York.  Sperzel Aff. ¶ 9; 2014 Employment Agreement at 3, § 5(f).  The 2014 Employment Agreement provided that notice to Sperzel was to be sent to his Maine address.  2014 Employment Agreement at 12, § 17 & 13.

When Sperzel joined Chembio, the company asked him to complete Form ID, an application for an access code to file documents through the electronic filing system of the United States Securities and Exchange Commission (SEC).  Sperzel Aff. ¶ 11.  Sperzel completed the form, which lists his Brunswick, Maine, residential address, and returned it to Richard Larkin, Chembio's chief financial officer, who filed it with the SEC.  *Id.*; Exh A. (ECF No. 24-1) thereto at Page ID ## 326-27.

In connection with the 2014 Employment Agreement, Sperzel was granted options to purchase up to 250,000 shares of Chembio's stock.  2014 Employment Agreement at 4, § ¶ 6(a).  The grant of those options, which was negotiated as part of Sperzel's initial offer of employment, was set forth in seven separate stock agreements (the "2014 Stock Option Agreements"), each dated March 18, 2014, and bearing Sperzel's Maine residential address.  Sperzel Aff. ¶ 16; Exhs. C (ECF No. 24-1) thereto at Page ID ## 343-53, D (ECF No. 24-1) thereto at Page ID ## 355-65, E (ECF No. 24-2) thereto at Page ID ## 367-77, F (ECF No. 24-2) thereto at Page ID ## 379-89,

G (ECF No. 24-2) thereto at Page ID ## 391-401, H (ECF No. 24-2) thereto at Page ID ## 403-13, I (ECF No. 24-2) thereto at Page ID ## 415-25.

Chembio's commuting records indicate that Sperzel was working at Chembio's offices in New York during the week of March 16-22, 2014.  Goldman Decl. ¶ 8; Exh. C (ECF No. 17-3) thereto at Page ID ## 252-53.  The 2014 Stock Option Agreements were executed on Chembio's behalf by Richard Larkin, who at that time was Chembio's chief financial officer and worked full-time in New York.  Exhs. C-I to Sperzel Aff. at Page ID ## 347, 359, 371, 383, 395, 407, 419; Declaration of Katherine Davis ("Davis Decl.") (ECF No. 18) ¶ 14.

On March 31, 2017, Sperzel entered into a new employment agreement with Chembio (the "2017 Employment Agreement").  Sperzel Aff. ¶ 13.  He was not in New York when he signed that agreement, which bears his Maine residential address.  *Id*. ¶¶ 13-14; [2017] Employment Agreement, Exh. B (ECF No. 24-1) thereto, at Page ID # 341.  The 2017 Employment Agreement was executed by Chembio in New York.  Exh. B to Sperzel Aff. at Page ID # 341; Davis Decl. ¶ 14.  In connection with that new three-year employment agreement, Sperzel was granted additional stock options pursuant to a series of three stock option agreements (the "2017 Stock Option Agreements").  Sperzel Aff. ¶ 16; Exhs. J (ECF No. 24-3) thereto at Page ID ## 427-37, K (ECF No. 24-3) thereto at Page ID ## 439-49, L (ECF No. 24-3) thereto at Page ID ## 451-61.  The 2017 Stock Option Agreements were signed by Larkin on behalf of Chembio but contain no signature from Sperzel.  Exhs. J-L to Sperzel Aff. at Page ID ## 431, 443, 455.

In 2017, Sperzel became gravely ill while traveling outside of the United States and was airlifted to a hospital in Miami, Florida.  Sperzel Aff. ¶ 33.  After a brief hospital stay in Florida, he traveled to New York, where he led Chembio's quarterly Board of Directors meeting and annual shareholder meeting and made its first-quarter earnings report to Wall Street, all while wearing a

portable defibrillator.  *Id*.  Afterwards, he was admitted to Massachusetts General Hospital in Boston, Massachusetts, and diagnosed with Giant Cell Myocarditis, a rare heart disorder that can cause acute heart failure and often death.  *Id*.

Sperzel spent more than two months at Massachusetts General Hospital, where he eventually received a life-saving heart transplant, and four weeks at a rehabilitation center in Boston, Massachusetts.  *Id*. ¶¶ 34-35.  Given that extended stay, Sperzel provided Chembio with his girlfriend's contact information in North Attleboro, Massachusetts, as his emergency contact. *Id*. ¶ 36.  While Sperzel was recovering, and until he resumed his CEO role on a full-time basis on October 3, 2017, Chembio temporarily sent his company mail to his girlfriend's address as a convenience.  *Id*. ¶ 37.  Sperzel realized only after he left Chembio that the company had mistakenly changed his address to that of his girlfriend.  *Id*. ¶ 40-41.  He never authorized anyone at Chembio to do so.  *Id*. ¶ 42.

Throughout his employment with Chembio, Sperzel regularly conducted business on behalf of the company while in Maine.  *Id*. ¶¶ 23, 25.  For example, he sent work-related emails from his Chembio email account and had numerous conversations with Chembio representatives while he was in Maine, including on weekends and while he was on vacation.  *Id*. ¶ 23.  During 2015, with the knowledge and support of the Chembio Board of Directors, Sperzel traveled to Maine to meet with the chairman and CEO of a diagnostics company to negotiate terms of a strategic business transaction.  *Id*. ¶ 24.

During his employment with Chembio, Sperzel traveled extensively for work, including to Chembio's facilities in New York, Malaysia, Brazil, and Germany.  *Id*. ¶ 19.  He also traveled to meet with investors, investment bankers, strategic partners, government officials, and customers.

*Id.*  He stayed in hotels on Chembio business approximately 160 nights of each year of his employment with the company.  *Id.*

Consistent with Sperzel's employment agreements, unless he was traveling elsewhere on Chembio business or not working, he usually spent four days a week at Chembio's headquarters on Long Island, New York.  *Id.* ¶ 20.  He would drive his car to Connecticut, where he took a ferry to Long Island, and stay at a hotel for the duration of his workweek in New York, after which he would either return to Maine for the weekend or visit his children (two of whom continued to live in Massachusetts with his ex-wife after their divorce) or his girlfriend, who also lived in Massachusetts.  *Id.* ¶¶ 20, 22, 45.

The ferry and hotel receipts that Sperzel submitted to Chembio in connection with his commute to Long Island and Chembio business trips included his Maine residential address and were reviewed and approved by Chembio's chief financial officer.  *Id.* ¶¶ 21, 26; Exhs. M (ECF No. 24-3) thereto at Page ID # 463, N (ECF No. 24-3) thereto at Page ID # 465, O (ECF No. 24-3) at Page ID # 467.

When Sperzel booked hotel rooms for other Chembio Board members and executives in connection with company business, his name and Maine residential address would have appeared on those individuals' receipts.  Sperzel Aff. ¶ 27.  When Sperzel paid for Chembio work-related expenses using his personal Chase Visa credit card and submitted the receipts for reimbursement, his Chase Visa credit card statement showed his Maine residential address.  *Id.* ¶ 28; Exh. P (ECF No. 24-3) thereto at Page ID # 469.

Throughout Sperzel's six-year employment with Chembio, the company paid his wages by direct deposit into his bank account with TD Bank.  Sperzel Aff. ¶ 29.  The address listed on his TD Bank statements is his Maine residential address.  *Id.*; Exh. Q (ECF No. 24-3) thereto at Page

ID ## 471-72.  In each one of the tax years 2014 to 2019, Sperzel filed state tax returns as a Maine resident, and his state and federal tax returns for those years listed his Maine residential address. Sperzel Aff. ¶¶ 30-31; Exhs. R (ECF No. 24-3) thereto at Page ID # 474-75, S (ECF No. 24-3) thereto at Page ID ##  477-78.  Sperzel's W-2 statements from Chembio for the years 2014 to 2018 all show his Maine residential address.  Sperzel Aff. ¶ 32; Exhs. T (ECF No. 24-3) thereto at Page ID # 480, U (ECF No. 24-3) thereto at Page ID # 482, V (ECF No. 24-3) thereto at Page ID # 484.

On November 13, 2018, Sperzel received a letter dated November 12, 2018, from Gail Page, chair of the Chembio Compensation Committee, notifying him that the committee had approved an additional restricted stock award to him.  Sperzel Aff. ¶ 46; Exh. W (ECF No. 24-3) thereto at Page ID # 486.  The letter, on which Page copied Katherine Davis and John Potthoff, respectively the chair and a member of the Chembio Board of Directors, was addressed to him at his Brunswick, Maine, residential address.  *Id*.; Davis Decl. ¶ 2; Declaration of John Potthoff (ECF No. 19) ¶ 2.  After his departure from Chembio, Sperzel also received a letter from the Missouri Department of Revenue Taxation Division, sent to and received at his Brunswick, Maine, residential address, stating that, as an officer of Chembio, he was personally liable for the company's unpaid employer withholding taxes in that state.  Sperzel Aff. ¶ 47; Exh. X (ECF No. 24-3) thereto at Page ID # 488.

During 2019, Sperzel's relationship with the Chembio Board of Directors became strained over the issue of his compensation.  Davis Decl. ¶ 10.  Sperzel informed the Board on December 27, 2019, that he had an offer to become CEO of another company and asked the Board for a response.  *Id*.  After multiple calls, Sperzel and the Board were not able to agree on a new compensation package for him, and discussions turned to negotiating a separation agreement.  *Id*. The parties concluded their negotiations on a separation agreement on January 3, 2020, *id*. ¶ 12,

and electronically signed the agreement on January 7, 2020, Separation and Release Agreement ("Separation Agreement"), Complaint ¶ 46; Exh. N (ECF No. 1-14) thereto at 7.  The Separation Agreement contains a New York choice of law provision.  Separation Agreement at 7, § 15.

When Sperzel attempted to exercise his vested stock options after his departure from Chembio, he intended to sell that stock soon after the option exercise.  Sperzel Aff. ¶ 52.  The monies he would have received from the sale of that stock would have been deposited into the same TD Bank account bearing his Maine residential address in which Chembio deposited his wages during his employment with the company.  *Id.*

In connection with Sperzel's employment with Chembio, he completed and submitted to Chembio two separate direct deposit forms, one dated March 19, 2014, and another December 19, 2018.  Second Declaration of Neil Goldman ("Second Goldman Decl.") (ECF No. 26) ¶ 3; Exh. A (ECF No. 26-1) thereto.  Each of Sperzel's direct deposit forms directed that his wages be deposited into two separate bank accounts, with a fixed amount to be deposited in the first account and the remainder in the other.  Second Goldman Decl. ¶ 4; Exh. A thereto.

On September 8, 2020, Goldman accessed the public website for Bank of America, which showed that the routing number matching the first bank account listed on Sperzel's direct deposit forms (011000138) is affiliated with Bank of America accounts for the State of Massachusetts.  Second Goldman Decl. ¶ 5; Exh. B (ECF No. 26-2) thereto.  On September 8, 2020, Goldman also accessed the public website for TD Bank, which showed that the routing number matching the second bank account listed on Sperzel's direct deposit forms (211370545) is affiliated with TD Bank accounts in the states of Massachusetts and Rhode Island.  Second Goldman Decl. ¶ 6 & Exh. C (ECF No. 26-3) thereto.

Had Sperzel exercised any of his stock options, the relevant agreements each required that he deliver a written Exercise Notice to Chembio.  Goldman Decl. ¶ 16.  Chembio employees located in New York would have processed his exercise of his options.  *Id.* ¶ 15.  If Sperzel elected a cashless exercise, which allows payment of the strike price portion of the shares by surrendering an equivalent value of options, Chembio would have calculated the 10-day Volume Weighted Average Price for the shares in accordance with the relevant option agreements to determine the net shares he would receive.  *Id.* ¶ 16.  Alternatively, if Sperzel opted for a cash exercise, he would have needed to send the funds for the strike price to Chembio along with his Exercise Notice.  *Id.*

Once Chembio either determined the net shares due to Sperzel or confirmed that he had paid the full strike price, Goldman would have sent a letter to Chembio's transfer agent, Action Stock Transfer Corp., a Utah-based company that handles the actual issuance of the shares.  *Id.* The shares would then have been registered with AST for book purposes.  *Id.*  At that point, Sperzel could have elected to (i) leave the shares on AST's book, (ii) request that a paper certificate be prepared and issued by AST and sent to him, or (iii) set up a "deposit/withdrawal at custodian" (DWAC) transaction whereby Sperzel's broker would have posted the DWAC and retrieved the shares in book entry form from the transfer agent.  *Id.*

Sperzel filed the instant complaint against Chembio on June 3, 2020, alleging that its refusal to allow him to exercise his vested options constituted a breach of the Separation Agreement, the 2014 Stock Option Agreements, and the 2017 Stock Option Agreements, as well as a breach of the implied covenant of good faith and fair dealing.  Complaint ¶¶ 50, 90-165.  He also brought a claim for quantum meruit on the basis of the same conduct, which he alleged had unjustly enriched Chembio.  *Id.* ¶¶ 166-72.

### III.  Discussion

The First Circuit has instructed that the exercise of specific jurisdiction over an out-of-forum defendant is appropriate if three requirements are met:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.  Third, the exercise of jurisdiction must be reasonable.

*PREP Tours, Inc. v. Am. Youth Soccer Org*., 913 F.3d 11, 17 (1st Cir. 2019) (citation and internal punctuation omitted).  This inquiry "is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite affiliating circumstances are present."  *Id*. (citation and internal quotation marks omitted).  Factors relevant to assessing whether a plaintiff has shown both relatedness and purposeful availment in a contract case include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]"  *LP Sols., LLC v. Duchossois*, Civil No. 2:18-CV-25-DBH, 2018 WL 1768037, at *5 (D. Me. Apr. 11, 2018), *aff'd* 907 F.3d 95 (1st Cir. 2018) (citation and internal quotation marks omitted).

For the reasons that follow, I conclude that the plaintiff has failed to demonstrate relatedness or purposeful availment.  Either shortcoming is independently fatal to his bid to maintain this action in Maine.  *See, e.g., Copia Commc'ns, LLC v. AMResorts, L.P*., 812 F.3d 1, 4 (1st Cir. 2016) (while First Circuit doubted that plaintiff had "come close to satisfying" relatedness, purposeful availment, or reasonableness prongs of analysis, it could "comfortably rest the disposition of this appeal" on plaintiff's failure to demonstrate purposeful availment).  I need not and do not consider the so-called "Gestalt factors" pursuant to which the reasonableness of the exercise of jurisdiction is assessed.  *See, e.g., Sawtelle*, 70 F.3d at 1394 ("[A] failure to demonstrate

the necessary minimum contacts eliminates the need to even reach the issue of reasonableness: the gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled.") (citation and internal punctuation omitted).

### A. Relatedness

In assessing relatedness, "the First Circuit frequently notes that a consideration in a contract action such as this is whether the defendant's forum-based activity was instrumental in the contract's formation or breach." *Duchossois*, 2018 WL 1768037, at *5 (citation and internal punctuation omitted). "[T]o be constitutionally significant, forum-state contacts need not involve physical presence." *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 290 (1st Cir. 1999). However, "the relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." *Id.* (citation and internal punctuation omitted).[2]

Sperzel contends that he has made the requisite showing that Chembio's forum-based activity was instrumental to the formation or breach of the contracts at issue in this case, pointing out that (i) he negotiated the terms of his initial employment agreement while in Maine and a Maine resident, (ii) the 2014 Employment Agreement and the seven 2014 Stock Option Agreements bear his Maine residential address, (iii) the document Chembio filed with the SEC upon Sperzel's initial employment reflected his Maine address, (iv) while in Maine, he transacted company business by telephone, mail, and email, (v) he met with a potential business partner in Maine with Chembio's knowledge, (vi) throughout his employment with Chembio, the company

---

[2] The plaintiff's claims for breach of the implied covenant of good faith and fair dealing and quantum meruit require no separate analysis. "The First Circuit has repeatedly used a contract-oriented jurisdictional analysis in cases with related breach of contract and unjust enrichment claims." *Duchossois*, 2018 WL 1768037, at *5 n.12.

paid his wages to a TD Bank account bearing his Maine residential address, (vii) he submitted hundreds of receipts for reimbursement listing his Maine address that were reviewed and approved by Chembio's chief financial officer, and, (viii) had Chembio not unlawfully prevented him from exercising his vested stock options, which he planned to sell thereafter, he would have deposited the proceeds in the same TD Bank account.  *See* Opposition at 12-14.

He cites *Lucerne Farms*, 226 F. Supp. 2d at 260, *Henderson v. Laser Spine Inst. LLC*, 815 F. Supp. 2d 353, 369 (D. Me. 2011), *Doyle v. Merz N. Am., Inc*., 405 F. Supp. 3d 186, 193 (D. Mass. 2019), and *Ouellette v. True Penny People, LLC*, 352 F. Supp. 3d 144, 153 (D. Mass. 2018), for the proposition that this showing suffices.  *See* Opposition at 14.

Nonetheless, as Chembio counters, *see* Defendant's Reply in Support of Motion to Dismiss ("Reply") (ECF No. 25) at 2-5, the majority of the contacts on which Sperzel relies relate to the parties' general relationship, not to the formation or breach of the 11 agreements at issue, and the few remaining relevant contacts do not suffice to demonstrate relatedness.

As concerns contract formation, while Sperzel states that he negotiated the 2014 Stock Option Agreements from Maine, he offers no evidence of the number or nature of Chembio's communications with him during that process.  "[T]he due process inquiry turns on the defendant's contacts with the forum, not the location of the plaintiff's residence."  *Doyle*, 405 F. Supp. 3d at 193.  On the showing made, one cannot conclude that Chembio was even aware that Sperzel was in Maine at the time.  Moreover, Sperzel has not contested Chembio's evidence that the 2014 Stock Option Agreements were executed in New York.  While the related 2014 Employment Agreement arguably was formed in Maine – Sperzel avers he signed that agreement in this forum – it is not among the 11 agreements Sperzel alleges Chembio breached.  The formation of a related agreement, standing alone, does not satisfy the test of relatedness.

14

Likewise, while Sperzel avers that he was physically in both Maine and New York during negotiations leading to the formation of the 2017 Stock Option Agreements, he again offers no evidence of the number or nature of Chembio's communications with him while he was in Maine. He concedes that he never signed those agreements and presents no evidence that they were formed in this state. Further, although Sperzel avers that he was not in New York when he signed the related 2017 Employment Agreement, he does not state that he was in Maine.

Sperzel offers no evidence regarding Chembio's contacts, if any, with Maine bearing on the formation of the 2020 Separation Agreement.

As concerns contract breach, Sperzel contends that, had he exercised his stock options, he would have sold his shares and deposited the proceeds in his TD Bank account bearing his Maine address. While "courts repeatedly have held that the location where payments are due under a contract is a meaningful datum for jurisdictional purposes[,] . . . that fact alone does not possess decretory significance." *Phillips Exeter*, 196 F.3d at 291 (citations omitted). In any event, for two independent reasons, Sperzel's reliance on any deposit of proceeds to his TD Bank account is misplaced. First, Maine would not have been the location of the payment: the routing number of Sperzel's TD Bank account indicates that it was located in Massachusetts or Rhode Island, not in Maine.

Second, and in any event, Chembio would not have deposited those proceeds. Had Sperzel exercised his stock options, Chembio employees in New York would have first processed the exercise of the options to determine the strike price of the shares, and then Chembio would have directed its transfer agent in Utah to issue the shares to Sperzel, who then could have sold the shares through his stockbroker. On the record presented here, the alleged breach of the 11

agreements at issue seemingly occurred in New York, where Chembio processes requests to exercise stock options.  Regardless, there is no evidence that it occurred in Maine.

Sperzel's showing, hence, "constitute[s] too thin a reed to support the district court's exercise of personal jurisdiction" over Chembio.  *163 Pleasant St.*, 960 F.2d at 1090.[3]

## B.  Purposeful Availment

"The purposeful availment prong represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior."  *C.W. Downer*, 771 F.3d at 66 (citation and internal quotation marks omitted).  "The cornerstones of this inquiry are voluntariness and foreseeability[,]" which "places the emphasis on the defendant's intentions and prohibits jurisdiction based on random, fortuitous, or attenuated contacts."  *Id.* (citation and internal quotation marks omitted).

"In contract cases, [the First Circuit has] found that the exercise of jurisdiction is reasonably foreseeable when the defendant deliberately directed its efforts toward the forum state or when the defendant entered a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State."  *Duchossois*, 907 F.3d at 104 (citations and internal punctuation omitted).  Sperzel demonstrates neither.

---

[3] *Lucerne Farms*, *Henderson*, *Doyle*, and *Ouellette* are distinguishable.  In each of those cases, plaintiffs demonstrated significant specific forum-based contacts by defendants related to their breach of contract or other claims.  *See Lucerne Farms*, 226 F. Supp. at 257, 260 (New York defendant allegedly breached sales agreement at issue by failing to deliver operational baling machine, or provide start-up assistance and reimbursement for parts and subsequent servicing, to Maine plaintiff); *Henderson*, 815 F. Supp. 2d at 368-69 (Florida defendants allegedly breached agreements to provide acceptable medical treatment and ensure insurance coverage to Maine plaintiff after calling and faxing plaintiff in Maine regarding arrangements for the treatment and costs/insurance coverage at issue); *Doyle*, 405 F. Supp. 3d at 189-90, 193 (defendant North Carolina employer allegedly liable for its supervisory employees' harassment of, and retaliation against, plaintiff saleswoman in her assigned sales territory of Massachusetts); *Ouellette*, 352 F. Supp. 3d at 149-50, 153 (Florida defendant allegedly breached employment contract with Massachusetts plaintiff after negotiating contract with him while he was home in Massachusetts and then entering into contract that envisioned his performance of work from Massachusetts).

Sperzel contends that Chembio deliberately availed itself of the privilege of conducting business in Maine because (i) Sperzel "worked regularly and continuously on behalf of Chembio and with Chembio's knowledge while he resided and worked in Maine, including communicating with Chembio representatives and meeting with a potential business partner[,]" (ii) Chembio paid his wages to his TD Bank account bearing his Maine address, (iii) Chembio received and approved expense reports and issued W-2 statements bearing his Maine address, and (iv) Page sent a letter to him at his Maine address on behalf of the Compensation Committee notifying him that he had been approved for an additional restricted stock award. Opposition at 15-16. He adds that he even received a letter at his Maine address from another state warning him that he was personally liable for Chembio's tax liability as a company officer. *See id*. at 16.

He argues that, because "Sperzel's Maine residency was well known to Chembio, . . . the Company's presence before a court in Maine was foreseeable[,]" citing *Henderson*, 815 F. Supp. 2d at 371, *Reed & Reed, Inc*. *v. George R. Cairns & Sons, Inc*., 519 F. Supp. 2d 148, 154 (D. Me. 2007), *Doyle*, 405 F. Supp. 3d at 193, and *Ouellette*, 352 F. Supp. 3d at 154, for the proposition that an adequate showing of purposeful availment has been made. *See id.*

In this context, as in the relatedness context, the only contacts relevant to analysis are those bearing on the claims at issue in the case. *See, e.g*., *Copia Commc'ns*, 812 F.3d at 5 (disregarding certain of defendant's contacts with forum state in analyzing purposeful availment when "[n]o claim in this lawsuit . . . arises out of or relates directly to any of these contacts," rendering them irrelevant). None of the contacts on which Sperzel relies to demonstrate purposeful availment has any apparent bearing on his claims for breach of the 11 agreements at issue.[4]

---

[4] While the 2018 letter from Page informed Sperzel that the Chembio Compensation Committee had approved an additional restricted stock award to him, Sperzel seemingly cites the letter, sent to him at his Maine residential address, to rebut Chembio's evidence that it believed he resided in Massachusetts, not Maine. *See* Motion at 2-3. There is no apparent connection between the 2018 letter and the 2014 and 2017 stock option grants at issue in this suit.

In any event, to the extent that Sperzel relies on his work in Maine on Chembio's behalf, it is undisputed that Chembio expected him to work in New York when not traveling on Chembio business, and he did so.  With one exception – Sperzel's meeting with a potential business partner in Maine – Sperzel introduces no evidence that Chembio was aware of – let alone directed – his work from Maine.  Sperzel's reliance on deposits by Chembio to his TD Bank account falls short of constituting a forum connection for the reasons discussed above.  This leaves Chembio's mere knowledge that Sperzel resided in Maine, which, on its face, does not demonstrate purposeful availment of the privilege of conducting business in Maine.  *See, e.g., Prairie Eye*, 530 F.3d at 28 (a "defendant's awareness of the location of the plaintiff is  not, on its own, enough to create personal jurisdiction over a defendant"); *Harlow v. Children's Hosp*., 432 F.3d 50, 63 (1st Cir. 2005) ("Jurisdiction cannot be created by and does not travel with the plaintiff . . . wherever she goes.").[5]

## IV.  Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the motion to dismiss without prejudice for lack of personal jurisdiction over the defendant, Chembio.

---

[5] Again, *Henderson*, *Reed & Reed*, *Doyle*, and *Ouellette* are distinguishable.  In each of those cases, defendants voluntarily and knowingly initiated contacts with plaintiffs in the forum state related to the claims at issue.  *See, e.g*., *Henderson*, 815 F. Supp. 2d at 371 (in action alleging breach of agreement to provide medically acceptable treatment and ensure insurance coverage, Florida defendants "began a series of promotional correspondence – multiple phone calls, faxes, and emails – intended to solicit [Maine plaintiff's] business and induce him to come to Florida" for the "advertised surgery"); *Reed & Reed*, 519 F. Supp. 2d at 151-52, 154-55 (defendant Massachusetts contractor headquartered in New Hampshire solicited bid from plaintiff Maine subcontractor resulting in subcontract and later Mutual Defense Agreement that plaintiff alleged were breached); *Doyle*, 405 F. Supp. 3d at 189-90, 193-94 (defendant North Carolina employer, which assigned plaintiff saleswoman a territory including Massachusetts, knew that she "would work and sell its products in Massachusetts[,]" where she alleged she had been harassed and retaliated against by supervisors); *Ouellette*, 352 F. Supp. 3d at 150, 154 (Florida defendant's "voluntary actions in [Massachusetts] – entering into an employment contract with a Massachusetts resident that envisioned performance in the forum – certainly rendered suit in the forum [for breach of that contract] foreseeable").

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 7th day of February, 2021.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge